**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **DAVID H. STENMARK,**<br>**Plaintiff**<br><br>**v.**<br><br>**BANK OF AMERICA CORPORATION,**<br>**as successor and assignee of**<br>**FLEETBOSTON FINANCIAL**<br>**CORPORATION, SEPARATION PAY**<br>**AND BENEFITS PLAN OF**<br>**FLEETBOSTON FINANCIAL**<br>**CORPORATION AND**<br>**PARTICIPATING SUBSIDIARIES, and**<br>**MAURO A. CIERI, in his capacity as**<br>**Plan Administrator,**<br>**Defendants** | : | **C.A. No. 05-** 312 ML |

**COMPLAINT**

## I. Introductory Statement

1. This is an action brought by the Plaintiff seeking declaratory, injunctive, and other equitable relief, compensatory and punitive damages, attorney's fees, and litigation expenses, and other remedies against the Defendants for violations of various provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§1001-1461 ("ERISA"), arising out of the wrongful denial and deprivation of benefits, failure to automatically provide notice and furnish required benefit plan information, and failure to furnish benefit plan information upon request, as well as common law claims for fraud and negligent misrepresentation.

## II. Parties

2. Plaintiff David H. Stenmark is a resident of the City of Cranston, County of Providence, State of Rhode Island.

3. Defendant Bank of America ("BOA") is a corporation duly organized and incorporated pursuant to the laws of the State of North Carolina, with a principal place of

business located at 100 N. Tryon Street, Charlotte, North Carolina 28255, and is registered to conduct business within the State of Rhode Island. On or about April 1, 2004, Defendant BOA merged with FleetBoston Financial Corporation ("Fleet"). As a result of the merger ("merger"), BOA is the successor and assignee of all legal rights and obligations of Fleet as it pertains to the within matter.

4. Defendant Separation Pay and Benefits Plan of FleetBoston Financial Corporation and Participating Subsidiaries ("Plan") is an employee benefits plan within the meaning of and subject to the requirements of ERISA, of which Plaintiff is a beneficiary.

5. Defendant Mauro A. Cieri ("Cieri") was, at all relevant times, BOA's designated Plan Administrator of the Plan, as defined under ERISA. On information and belief, Cieri was also the Plan Administrator of other ERISA covered plans of BOA and its predecessors ("other ERISA plans"), of which Plaintiff is a beneficiary.

6. At all relevant times, BOA was the designated sponsor of the Plan, as defined under ERISA, and retained sufficient control or influence and/or took a sufficiently active part in the administration of the Plan and other ERISA plans to subject it to liability for claims under ERISA arising out of the administration of the Plan and other ERISA plans. *See, e.g., Law v. Ernst & Young*, 956 F.2d 364, 372-374 (1st Cir. 1992).

## III. <u>Jurisdiction</u>

7. This Court has jurisdiction over Plaintiff's ERISA claims pursuant to 28 U.S.C. §1331 and jurisdiction over Plaintiff's common law claims pursuant to 28 U.S.C. §1367(a).

## IV. <u>Venue</u>

8. Venue is proper in this Court insofar as the Defendants are conducting business in the State of Rhode Island and are therefore deemed to reside in the District of Rhode Island, in compliance with the requirements set forth in 28 U.S.C. §1391.

## V. Material Facts

### A. Employment History and Performance

9. Plaintiff is a sixty-three (63) year old male, former Senior Project Manager and Regional Planner in the Fleet Global Workplace ("Facilities division"), who was responsible for project management in Rhode Island at the time of his separation from BOA on or about June 2, 2004. Plaintiff had a nearly forty (40) year work relationship with BOA and its predecessors.

10. Plaintiff was initially employed by Industrial National Bank from October 4, 1964 to January 2, 1978 as a Branch Maintenance Specialist and was later promoted to Bank Properties Specialist. He was immediately thereafter employed by Hospital Trust National Bank ("Hospital Trust") as an Assistant Vice President. In 1992, Hospital Trust was acquired by BankBoston and the Plaintiff was retained by BankBoston as a Senior Project Manager. On or about March, 2000, BankBoston was acquired by Fleet and the Plaintiff was retained by Fleet as a Senior Project Manager in the Fleet Global Division. On or about April 1, 2004, Fleet merged with BOA, and the Plaintiff was retained as an employee of BOA in the same capacity.

11. Throughout the course of his foregoing employment with BOA, as well as its above described predecessors, Plaintiff was regarded as a valued, productive and loyal employee, as evidenced, in part, by excellent employment reviews, promotions, and merit bonus and salary increases. His salary for 2004 was to be $90,250 for the year. Over the past five (5) years he received regular bonuses: 2004 – $20,250 (9000 in deferred stock options and 2,250 in cash); 2003 - $8,000; 2002 – (freeze on bonuses); 2001 - $7,500; 2000 - $6,500; and, 1999 - $8,300. Indeed, in the performance review conducted in March of 2004, just prior to his termination, he was rated as an "Outstanding Performer."

**B. Background to Dispute and Termination**

12. When Fleet bought BankBoston, one of the staff reduction efforts resulted in the termination of 100 or more (estimated) employees in the Facilities division, whose jobs included the management of the (former BankBoston) buildings, to match the Fleet model. These employees were given a severance package determined by their length of service with a maximum of 86 weeks pay to be paid in a lump sum or paid in bi-weekly payments through the term of the severance allotment. Their former jobs/responsibilities were bid to outside property management companies with the stipulation that the terminated employees would be given a job with the successful bidder at the same pay that they were making at Fleet.

13. Fleet conveyed to all other employees, including Plaintiff, that this same policy would be written into any and all future acquisitions/mergers of Fleet in the future, with the exception that the future maximum allotment would be the Fleet standard of one (1) year. When the BOA acquisition was announced, this policy was again stated with a nine (9) week bonus to be added across the board.

14. Mr. Chad Gifford ("Gifford"), Chairman of the Board of Fleet, went to great lengths, on more than a few occasions, to acknowledge that employees on all levels were directly responsible for the ongoing success of Fleet. Fleet management, including Gifford, promised to all Fleet employees that, should Fleet go through any future acquisitions/mergers, they would be treated in the same manner regarding this severance policy.

15. Fleet continuously reinforced this promise and constantly asked more of its employees in terms of cutting costs, working harder and longer and generally striving to enhance the bank's bottom line. In more than a few cases, employees were asked to perform two jobs or more to keep the staff levels as low as possible.

16. During the latter part of 2002 through the latter part of 2003, Plaintiff was asked to fill the vacant position of "Regional Planner" for Rhode Island while continuing to perform his job of "Senior Project Manager" of Rhode Island. The Regional Planner position had been open for about two (2) years prior to his taking it on and had been filled by an outside project management/architectural firm.

17. Plaintiff was asked to "temporarily" fill the position because Fleet did not want to incur added expense at this time to hold down costs to present a better financial picture for the bank. This was the practice of Fleet to demonstrate savings, particularly when a contemplated merger or acquisition was pending or being negotiated.

18. Fleet represented to Plaintiff that his extraordinary efforts would be rewarded in the future. In particular, on numerous occasions, Fleet continued to emphasize to Plaintiff and others that the Fleet severance package would remain intact and continuous through any future mergers/acquisitions.

19. Immediately prior to Plaintiff's termination on June 2, 2004, he was notified by BOA that he was scheduled for a job interview with a representative of Trammell Crow Company (TCC) to be held in Boston. Plaintiff was advised that TCC was the successful bidder for the management of the BOA properties and projects acquired by BOA as a result of the Fleet acquisition, and that it would be fulfilling the Facilities division functions previously performed by employees terminated or to be terminated by BOA, such as the Plaintiff.

20. BOA representatives and agents advised Plaintiff in more than one communication that Plaintiff was required to attend this interview and ***accept any job offer or forfeit any rights to severance benefits.***

21. TCC subsequently made a job offer to Plaintiff on May 28, 2004, to which he was required to respond by June 1, 2004, or be terminated without any severance benefits. Plaintiff

vigorously asserted and continues to assert that the position offered is not comparable to his former position at BOA. Nevertheless, Plaintiff subsequently accepted the job offer from TCC, after being orally advised by human resources personnel at BOA, that even though he was being terminated by BOA, he was not entitled to any separation pay and benefits, because his functions where being outsourced by BOA, and TCC was offering him employment.

22. Insofar as the Plan provides for, *inter alia*, the payment of separation pay and benefits to all full time employees who are terminated by BOA due to job elimination or a reduction in force, the Plaintiff duly applied in writing for separation pay and benefits under and in accordance with the Plan. Plaintiff was initially denied benefits, and he subsequently pursued and exhausted all Claim Review Procedures set forth in the Plan, culminating in a final, written denial dated March 3, 2005 received from Ciero, in his capacity as Plan Administrator.

**C. Wrongful Denial and Deprivation of Separation Pay and Benefits**

23. It is undisputed that Plaintiff was terminated by BOA as of June 2, 2004 due to job elimination or a reduction in force. It is further undisputed that prior to Plaintiff's termination by BOA, at least in the Facilities division, BOA had uniformly treated outsourcing as a termination for severance benefits purposes, even where a former employee was offered and accepted a comparable position with the outsource provider, as evidenced by the events following the BankBoston merger described above.

24. At the time of the BankBoston merger, the relevant provision of Fleet's separation plan provided for the following exclusion from severance benefits: "Employees who accept a [comparable] position with another Fleet company or continue employment with, or refuse an offer of employment by an employer who acquires any of the assets or operations of a Fleet company or business."

25. At all relevant times, the Plan defined a comparable job as having all of the following four elements: 1) annual base salary no less than the former position; 2) no significant change in work schedule; 3) requires a reasonably similar employment background and skill set as the former job; and, 4) is based within a reasonable distance of the former job.

26. BOA communications on the company intranet and, on information and belief, the Summary Plan Description, continued to reflect this same exclusion and definition of comparable job. Subsequent to the announcement of the merger, BOA assured employees that the Plan had not and would not be altered.

27. Nevertheless, on or about late April of 2004, the following phrase was apparently parenthetically added to the end of the foregoing exclusion: "e.g., sale of business, outsourcing, joint venture." The foregoing change, at least as it relates to "outsourcing," is a substantive amendment to the Plan, insofar as "outsourcing" merely entails the procurement of services from an external, as opposed to an internal source. Under no reasonable interpretation could it be understood to mean the same thing as the "acquisition of the assets or operations" of BOA, ***which is precisely why Defendants modified the provision by adding the above parenthetical***.

28. Subsequent to his acceptance of the TCC job offer, Plaintiff learned that the Plan had purportedly previously been modified to also exclude a terminated employee who accepts a *non-comparable* offer of employment.

29. On information and belief, the BOA employee who came up with the idea of reneging on the severance pay promise to Facilities division employees received a very substantial bonus for coming up with that idea. In fact, in an email to her fellow BOA employees, she boasted about how she "had pulled every outsourcing trick in the book."

30. On information and belief, BOA employees involved in the administration of the Plan were advised to encourage and/or coerce outsource vendors to hire displaced BOA

employees, particularly those with significant years of service, who would otherwise be entitled to substantial separation pay and benefits under the Plan.

31. The irony of the foregoing is that BOA employees who were not loyal, productive and/or otherwise employed for any significant period of time, were terminated and provided with separation pay and benefits under the Plan as a reward for their deficient performance and/or brief tenure. On the other hand, loyal, valued, long term employees such as the Plaintiff were provided no severance and *forced* to accept employment with a new employer, with out any job security, for less compensation, and which typically amounted to a demotion in terms of the nature, quality, and/or quantity of duties and/or work environment.

32. On information and belief, Defendants did not file an amended or modified Plan within the time frame and as required by ERISA when the foregoing purported modifications to the Plan were made in violation of, *inter alia*, 29 U.S.C. §1024(a)(1)(D).

33. On information and belief, Defendants also failed or refused to furnish the purported amended or modified Plan to the Plaintiff within the time frame and as required by ERISA, in violation of, *inter alia*, 29 U.S.C. §1024(b)(1).

34. Accordingly, since the Plan was never lawfully modified or otherwise not amended in accordance with the requirements imposed under ERISA and Plaintiff was undisputedly **not** offered a job by BOA, Plaintiff was terminated and his termination is a "Covered Termination" under the Plan. Plaintiff is therefore entitled to separation pay and benefits pursuant thereto.

35. Plaintiff relied to his detriment on representations of the Defendants, as set forth in the BOA intranet, the Summary Plan Description, and/or expressed orally. Accordingly, in addition and in the alternative, Defendants are estopped from denying Plaintiff separation pay and benefits under the Plan.

36. Moreover, even if, notwithstanding the plain wording and past interpretation of the Plan, Plaintiff was not "terminated" in light of the outsource job offered by TCC, Plaintiff contends that his new position is not a "comparable job" within the meaning of the Plan.

37. Plaintiff's new position with TCC clearly does not satisfy, *inter alia*, at least two of the elements, specifically similarity of 1) employment experience and skill sets and 2) work schedule.

38. As Senior Project Manager, Plaintiff's job function was to *manage outside project management vendors and outside move management vendors.* The title is actually somewhat of a misnomer, and should perhaps have been more like "Project Resource Vendor Manager."

39. Plaintiff acted as a "Planner" to develop the scope of a proposed project and assist in the budgeting process. Once the project and funds were approved, it was his responsibility to hire a Project Management vendor who would manage the project hands-on, from soup to nuts.

40. Plaintiff retained overall responsibility for ***the management of the Project Management vendor's performance only—he was neither responsible for nor did he perform the day-to-day project management activities.*** If the project involved just moving people, he would hire a Move Management vendor who would do the actual data and voice collection and coordinate the actual move with the moving company.

41. Plaintiff was also responsible for the high level financial tracking and reporting to make sure the projects did not exceed budget.

42. Moreover, in his former position, Plaintiff never worked nights or weekends, since the performance of the hands-on activities was the responsibility of the Project Management vendor or Move Management vendor.

43. Plaintiff's new job as project manager with TCC is to perform the actual hands-on project management and move management functions described above *as the outsource Project*

*Management and/or Move Management vendor.* It is now his job to perform the work previously done by the vendors that he previously hired and oversaw. ***In addition, he is expected to work nights, weekends, etc., as necessary to perform those duties.***

44. Accordingly, both the employment background and skill set required of overseeing vendors as Plaintiff did in his former job, are significantly different than that required at TCC, ***where he performs the hands-on, day to day management of projects and moves in the field.***

45. In addition, the change from a basically nine-to-five job at a desk to one, ***which requires work on nights, weekends, after hours, and in the field, amounts to a significant change in work schedule***.

46. Defendants failed or refused to comply with ERISA disclosure and notice requirements in purportedly modifying the Plan, and the failure to so comply involved exceptional circumstances, including bad faith, active concealment, fraud, and induced reliance, and was otherwise designed to and resulted in financial benefit to the Defendants, to the Plaintiff's detriment.

47. Defendants intentionally mislead Plaintiff as to the terms of and the benefits to which he was entitled under the Plan, in particular, that he had to accept the TCC job, whether or not it was comparable, or forfeit any benefits under the Plan, *inter alia*, and thus induced Plaintiff to accept a non-comparable job, which he would not have accepted but for Defendants' misrepresentations, thereby prejudicing Plaintiff's entitlement to benefits under the Plan.

48. Defendants knowingly, intentionally, and/or negligently deceived Plaintiff, a Plan beneficiary, in order to save the Defendants money at the Plaintiff's expense, and thereby failed to discharge their fiduciary duties under the Plan solely in the interests of the Plaintiff and in

accordance with 29 U.S.C. §1104, and, therefore violated ERISA-imposed fiduciary obligations, 29 U.S.C. §§1101-1114. *Varity Corporation v. Howe,* 516 U.S. 489, 506 (1996).

**D. Failure to Disclose and/or Provide Requested Information**

49. A Plan Administrator is required to provide information, including, but not limited to, a Summary Plan Description, within thirty (30) days after receiving a written request from a covered employee such as Plaintiff. 29 U.S.C. §1132(c).

50. A Plan Administrator who fails or refuses to provide such information after receiving such a written request is liable to the employee for a civil penalty in the amount of $110.00 per day for failing to provide such information. 29 U.S.C. §1132(c)(1)(B), and regulations promulgated pursuant thereto.[1]

51. In mid April 2004, Plaintiff requested from Defendants by way of an e-mail information relative to what his retirement package would be if he elected to retire prior to his anticipated termination by BOA. He subsequently received a letter of acknowledgement on April 19, 2004, confirming his request for the foregoing information and that the request had been assigned to a Dolly Gaudet.

52. Plaintiff did not receive any response to his foregoing request until packets of retirement information were received by him on October 25 and 28 and November 2 and 16, 2004. The information received from the Defendants did not fully respond to this request.

53. By way of a letter from his attorney dated August 24, 2004, directed to BOA in its capacity as the Plan Administrator or agent thereof, Plaintiff requested, *inter alia*, a Summary Plan Description relative to any employee benefit plans of BOA, as defined under ERISA, in

---

[1] The $100.00-per-day penalty was raised to $110.00 for ERISA, 29 U.S.C. §1132(c)(1) violations, occurring on or after July 30, 1997. U.S. Department of Labor announcement, 62 Fed. Reg. 40696, July 29, 1997, issued by authority of §4 of Federal Civil Penalties Adjustment Act of 1990 (Pub. L. No. 101-410, 104 Stat. 890), as amended by §3720E of Debt Collection Improvement Act of 1996, (Pub L. No. 104-134, 110 Stat. 1321-373).

effect during the period of his employment with BOA, including, but not limited to, separation pay and benefits, vacation pay, and retirement benefits of not only BOA, but its predecessors, including Industrial National Bank, Hospital Trust, BankBoston, and Fleet. Plaintiff's request included, but was not limited to, documentation relative to eligibility or vesting requirements applicable not only to Plaintiff, but to any person that participates in the Plan or any other ERISA covered plan and their contributions to date, written policy requirements for any unused employee sick or vacation time, and the value of Plaintiff's current assets in the Plan or any other ERISA plans (including any unused sick or vacation time), and clarification of his right to benefits or future benefits.

54. Plaintiff did not receive any response to his foregoing request until a letter with enclosures was received from counsel for BOA dated January 11, 2005. The information received from the Defendants did not fully respond to this request.

55. Defendants failed or refused to automatically furnish Plaintiff with a Summary Plan Description and other required information in violation of 29 U.S.C. §§1021-1031.

56. Defendants failed or refused to timely furnish a Summary Plan Description and other information to the Plaintiff after receiving a written request for the same in violation of 29 U.S.C. §1132(c).

57. Defendants' conduct in failing to furnish or disclose in a timely fashion or failing to fully furnish or disclose the foregoing information was in bad faith.

58. Plaintiff has and continues to be harmed and prejudiced by the failure and/or refusal of the Defendants to timely furnish him with a copy of the Summary Plan Description and other information as required by ERISA and/or expressly requested by the Plaintiff, thereby, *inter alia*, impairing and prejudicing his ability to retire as an employee of BOA and receive compensation and benefits under the Plan and/or under other ERISA plans.

59. BOA, in part, acted as Plan Administrator with respect to the dissemination of information concerning the Plan and other ERISA plans, so as to subject it to liability under 29 U.S.C. §1132(c). *See Law v. Ernst & Young*, 956 F.2d 364, 373 (1st Cir. 1992).

60. To the extent BOA exercised discretion as Plan Administrator, it was operating under a conflict of interest, which must be weighed as a factor in determining whether there was an abuse of discretion and/or whether Plaintiff was otherwise wrongfully denied or deprived of ERISA benefits. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

61. Defendants' wrongful and/or unlawful acts and/or omissions, including, but not limited to, those described herein, were committed negligently, with gross negligence, intentionally, and/or with reckless indifference to the statutory and/or common law rights of the Plaintiff, and/or constituted oppression or bad faith, and/or were motivated by malice, wantonness or willfulness of such an extreme nature as to amount to criminality.

62. As a proximate result of Defendants' wrongful and/or unlawful acts and/or omissions, including, but not limited to, those described herein, the Plaintiff has suffered and will continue to suffer loss of income and various ERISA benefits, severe mental and physical anguish, pain and suffering, and loss of enjoyment of life, and has incurred and will continue to incur expenses for legal services and other great damage.

## VII. <u>Claims for Relief</u>

63. Plaintiff incorporates the allegations contained in ¶¶1 through 62 above in the counts set forth below.

### Count One
### ERISA, 29 U.S.C. §1132(a)(1)(B)
### (denial of benefits)

64. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, wrongfully denied and/or deprived Plaintiff of benefits

due him under the terms of the Plan and/or other ERISA plans, thereby causing Plaintiff to sustain damages as aforesaid, for which he is entitled to relief pursuant to 29 U.S.C. §1132(a)(1)(B).

**Count Two**
**ERISA, 29 U.S.C. §1132(a)(3)**
**(breach of fiduciary duty--denial of benefits)**

65. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, breached their fiduciary obligations under ERISA and wrongfully denied or deprived Plaintiff of benefits due him under the terms of the Plan and/or other ERISA plans, thereby causing Plaintiff to sustain damages as aforesaid, for which he is entitled to relief pursuant to 29 U.S.C. §1132(a)(3).

**Count Three**
**ERISA, 29 U.S.C. §1132(a)(3)**
**(breach of fiduciary duty--failure to automatically provide notice and furnish information)**

66. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, failed to automatically provide notice and furnish information as required under ERISA, thereby causing Plaintiff to sustain damages as aforesaid, for which he is entitled to relief pursuant to 29 U.S.C. §1132(a)(3).

**Count Four**
**ERISA, 29 U.S.C. §1132(a)(1)(A)**
**(failure to furnish information upon request)**

67. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, failed or refused to furnish information as provided under ERISA, after receiving a written request from the Plaintiff, thereby causing Plaintiff to sustain damages as aforesaid, for which he is entitled to the relief provided under 29 U.S.C. §1132(c).

**Count Five**
**Fraud**

68. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, knowingly made false representations to the Plaintiff, upon which Plaintiff relied to his detriment, thereby committing fraud, causing the Plaintiff to sustain damages as aforesaid.

**Count Six**
**Negligent Misrepresentation**

69. In the alternative, Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, negligently made false representations to the Plaintiff, upon which Plaintiff relied to his detriment, causing the Plaintiff to sustain damages as aforesaid.

## VIII. Prayers for Relief

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

1. A declaratory judgment declaring that the acts and/or omissions of the Defendants complained of herein have wrongfully denied and/or deprived Plaintiff of benefits under ERISA and otherwise violated the Plaintiff's rights under the terms of the Plan and/or other ERISA plans, and/or constitute wrongful conduct amounting to fraud and/or negligent misrepresentation.

2. Enjoining and permanently restraining the Defendants from violating ERISA.

3. An award of all benefits due him under the Plan or other ERISA plans of the Defendants pursuant to 29 U.S.C. §1132(a)(1)(B).

4. An award of other appropriate equitable relief pursuant to 29 U.S.C. §1132(a)(3) and/or other applicable law.

5. An award of a civil penalty in the amount of $110.00 per day from the date of Defendants' refusal to provide information requested by Plaintiff in writing as provided under 29 U.S.C. §1132(c)(1)(B), and regulations promulgated pursuant thereto.

6. An award of reasonable attorneys fees and costs of litigation pursuant to 29 U.S.C. §1132(g)(1) and/or other applicable law.

7. An award of compensatory damages.

8. An award of punitive damages.

9. An award of such other and further relief as this Honorable Court deems just and proper.

## IX. Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## X. Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi, Esquire, and Michael D. Pushee, Esquire, as trial counsel.

Plaintiff,
**David H. Stenmark,**
By his attorneys,
**Sinapi, Formisano & Company, Ltd.**

**Dated: July 15, 2005**

**Richard A. Sinapi, Esq. (#2977)**

**Michael D. Pushee (#6948)**
100 Midway Place, Suite 1
Cranston, RI 02920
(401) 944-9690
(401) 943-9040 (facsimile)